IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| **AIRTRONIC USA, INC.,** | ) Case No. 12-09776 |
| | ) |
| Debtor. | ) Honorable Eugene R. Wedoff |

**AMENDED DISCLOSURE STATEMENT FILED IN CONNECTION WITH
AMENDED PLAN OF REORGANIZATION PROPOSED BY AIRTRONIC USA, INC.,
THE DEBTOR AND DEBTOR IN POSSESSION**

August 21, 2013

Charles S. Stahl, Jr. (Atty. No. 02699915)
Swanson, Martin & Bell, LLP
2525 Cabot Drive, Suite 204
Lisle, Illinois 60532
 (630) 799-6990
Fax: (630) 799-6901

Amy Z. Knapp (Atty. No. 6271655)
Thomas B. Fullerton (Atty. No. 6296539)
Swanson, Martin & Bell, LLP
330 North Wabash Avenue, Suite 3300
Chicago, Illinois 60611
(312) 321-8430
Fax: (312) 321-0990

Attorneys for

Airtronic USA, Inc., Debtor and Debtor in Possession

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **1**

    Table Summarizing Distributions Under Plan . . . . . . . . . . . . . . . . . . . . . . . . .  **6**

II. THE PURPOSE OF A DISCLOSURE STATEMENT . . . . . . . . . . . . . . . . . . . . .  **7**

III. SUMMARY OF THE PLAN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **8**

    A. Proposed Distribution For Allowed Claims
       Under The Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **8**

        1. Unclassified Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **8**

        2. Class 1 Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **10**

        3. Class 2 Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **10**

        4. Class 3 Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **11**

        5. Class 4 Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **12**

        6. Class 5 Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **13**

        7. Class 6 Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **13**

        8. Class 7 Interests . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . .  **15**

    B. Means For Implementation Of The Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **19**

    C. Other Significant Plan Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **19**

        1. Unexpired Leases And Executory Contracts . . . . . . . . . . . . . . . . . . . .  **20**

        2. Bankruptcy Court Retention Of Jurisdiction . . . . . . . . . . . . . . . . . . .  **20**

    D. Confirmation Of The Plan. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **20**

    E. Alternatives To The Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **21**

    F. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **21**

IV. THE COMBINED HEARING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **21**

V. THE DEBTOR AND THE BACKGROUND OF THE CHAPTER 11 CASE . . .  **22**

    A. History Of The Debtor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  **22**

i

      B.  Events Leading To The Involuntary Bankruptcy Filing . . . . . . . . . . . . . . . 23

      C.  Significant Events During The Reorganization Case . . . . . . . . . . . . . . . . . . 24

           1.  The Debtor's Ability To Use Cash Collateral . . . . . . . . . . . . . . . . . . 24

           2.  The Debtor's Compliance With Applicable Rules . . . . . . . . . . . . . . 25

           3.  The Debtor's Authority To Incur Secured Credit . . . . . . . . . . . . . . 25

           4.  About GDSI (OTC:GDSI) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

VI.  DESCRIPTION OF THE PLAN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

      A.  Classification Of Claims And Distribution To Classes . . . . . . . . . . . . . . . . 28

VII. CONFIRMATION OF THE PLAN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

      A. Best Interests Of Creditors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

      B. Feasibility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

      C. Acceptance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

      D. Confirmation Without Acceptance By All
         Impaired Classes. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

      E. Alternatives To The Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

      F. Effect Of Confirmation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

      G. Combined Hearing On Disclosure Statement And Plan. . . . . . . . . . . . . . . 31

VIII. TAX CONSEQUENCES OF THE PLAN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

IX.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

EXHIBIT A: Debtor's Amended Plan Of Reorganization

EXHIBIT B: Debtor's Balance Sheet At April 30, 2013

EXHIBIT C: Liquidation Analysis

EXHIBIT D: Biographies Of Debtor's Proposed Management

EXHIBIT E: Debtor's Financial Statements as of December 31, 2009, 2010 and 2011

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| IN RE: | ) Chapter 11 |
| | ) |
| AIRTRONIC USA, INC., | ) Case No. 12-09776 |
| an Illinois corporation, | ) |
| | ) Honorable Eugene R. Wedoff |
| Debtor. | ) |

### AMENDED DISCLOSURE STATEMENT FILED IN CONNECTION WITH
### THE DEBTOR'S AMENDED PLAN OF REORGANIZATION

### I.

### INTRODUCTION

On March 13, 2012, five of the larger general unsecured creditors of Airtronic USA, Inc. (the "Debtor") filed an involuntary petition against the Debtor under chapter 7 of the Bankruptcy Code. On May 16, 2012, the Debtor filed its response to the involuntary petition wherein the Debtor indicated its election to convert the Case to a Case under chapter 11 pursuant to § 706(a) of the Bankruptcy Code. On May 17, 2012 (the "Conversion Date"), an order for relief was entered, and this case was converted to a case under chapter 11 of the Bankruptcy Code. From and after the Conversion Date, the Debtor has remained in possession of its property and has conducted its affairs as a debtor in possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code for the purpose of rehabilitating its financial affairs for the benefit of all of its Creditors.

The Office of the United States Trustee (the "UST") monitors the administration of chapter 11 cases and has standing to raise, appear and be heard on any issue arising in such cases. On June 27, 2012, the UST conducted a meeting pursuant to § 341 of the Bankruptcy Code, at which time a representative of the Debtor appeared and was examined under oath. In addition, the UST appointed the following persons to serve on an Official Committee of Unsecured Creditors (the "Committee") in this case:

| UNSECURED CREDITOR | CREDITOR REPRESENTATIVE |
|---|---|
| AFCO-Products, Inc. | Ken Klancnik |
| AP Machine, Inc. | Peter Konieczny |
| Concise National Components, Inc. | Joseph L. Bender |
| Fox Machine & Tool, Inc. | Vee Lisiecki |

1

| G&G Tooling, Inc. | Witold Gruchalski |
|---|---|
| Total Solutions Central, Inc. | Paul Furmanski |
| Triple Edge Manufacturing, Inc. | Kirk Johnson |

The members of the Committee volunteered to serve on the Committee and were selected from a list filed by the Debtor with the Bankruptcy Court which listed the holders of the 20 largest Unsecured Claims against the Debtor's bankruptcy Estate. The Committee represents the interests of all holders of Unsecured Claims in this Case. Thereafter, the Bankruptcy Court authorized the Committee to employ Nathan Q. Rugg and the law firm Adelman & Gettleman, Ltd. to serve as its counsel in this Case.

Based upon the Debtor's books and records, as of the Petition Date and excluding the Claims of insiders, the Debtor had 72 Creditors who held Unsecured Claims in the aggregate sum of $1,729,072.68. Of this amount, the seven Creditors appointed to the Committee held Unsecured Claims in the aggregate sum of $1,044,138.23. Since the Committee members held over 60% of the Unsecured Claims in this case, the Committee was particularly well-suited to represent all Unsecured Claims.

On June 10, 2013, the Debtor filed a plan of reorganization and an accompanying disclosure statement. Following further discussions with various parties in interest and specific comments from the UST, the Committee, and the Debtor's pre-petition lender and post-petition lender, Southport Bank and Global Digital Solutions, Inc. ("GDSI"), respectively, on August 21, 2013, the Debtor filed an amended plan of reorganization (the "Plan"), a copy of which is attached hereto as Exhibit A. The Debtor filed the Plan for the purpose of restructuring its liabilities, continuing its business as a going concern, and affording fair and equitable treatment of the Claims of all of its Creditors. **The Debtor is informed and believes that the Committee, Southport Bank and GDSI all support confirmation of the Plan.**

The Bankruptcy Code provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." In order to comply with this requirement, the Plan classifies Claims in six separate classes, and the Interests of the holders of equity security in the Debtor are classified under Class 7. Claims that are classified in Class 3, Class 4, Class 5 and Class 6, and the Interests classified in Class 7, are impaired under the Plan. Accordingly, each holder of a Claim or Interest classified under Class 3, Class 4, Class 5, Class 6 and Class 7 is entitled to vote on the Plan. A Ballot for voting purposes accompanies the Plan.

The Claims classified in Class 1 and Class 2 are not impaired by the Plan. Since these Claims are unimpaired, the holders thereof are conclusively presumed to have accepted the Plan. Therefore, the votes of the Creditors holding these Claims will not be solicited. In addition to the seven Classes referred to above, the Plan also provides for Unclassified Claims, which consist of Administrative Claims, including the Claims of Professional Persons employed with

approval of the Bankruptcy Court by the Debtor and the Committee, as defined in paragraph 1.1.1 of the Plan.

The Plan is the product of financial accommodations provided to the Debtor by GDSI, which allowed the Debtor to stabilize its operations. The Bankruptcy Code requires a debtor in a chapter 11 case to seek and obtain approval of the bankruptcy court in order to obtain secured credit during the administration of the bankruptcy case. In this Case, DIP Bridge Loans were provided by GDSI to the Debtor pursuant to a series of DIP Bridge Loan Orders entered by the Bankruptcy Court. Specifically, the DIP Bridge Loan Orders entered by the Bankruptcy Court were (a) the interim order signed by the Bankruptcy Court on October 19, 2012, granting the Debtor's Emergency Motion to Obtain Credit and Incur Debt; (b) the Final Order signed by the Bankruptcy Court on December 26, 2012, authorizing the Debtor to obtain credit and incur debt secured by a senior lien and security interest on property of the Estate; (c) the Final Order signed by the Bankruptcy Court on March 15, 2013, approving that certain Bridge Loan Modification and Ratification Agreement relating to the DIP Bridge Loan; (d) the Final Order signed by the Bankruptcy Court on June 28, 2013, approving that certain Second Bridge Loan Modification and Ratification Agreement relating to the DIP Bridge Loan, and (e) the Final Order signed by the Bankruptcy Court on August 7, 2013, approving certain revised documents relating to the Second Bridge Loan Modification and Ratification Agreement. Although not presently anticipated, it is possible one or more additional DIP Bridge Loan Orders will be entered by the Bankruptcy Court on or before the Confirmation Date approving additional modifications of and/or amendments to the DIP Bridge Loan.

As of the filing of this Disclosure Statement, the Debtor was authorized by the Bankruptcy Court pursuant to the DIP Bridge Loan Orders to borrow up to a maximum amount of $1,250,000.00 from GDSI. The DIP Bridge Loan Order signed by the Bankruptcy Court on March 15, 2013, authorized the Debtor to borrow up to $700,000.00. The DIP Bridge Loan Orders signed on June 28, 2013 and August 7, 2013, increased the initial line of credit by $550,000.00. Each of the DIP Bridge Loan Orders was predicated on a specific budget approved by the Bankruptcy Court that identified the agreed upon uses of the funds borrowed by the Debtor under the DIP Bridge Loans.

All of GDSI's Secured Claims arising under the DIP Bridge Loans are classified in Class 3 in the Plan. By agreement among the Debtor and GDSI, and as fully disclosed to the Bankruptcy Court and set forth in the DIP Bridge Loan Orders, under the Plan the earlier Class 3 Claims held by GDSI in the aggregate sum of approximately $700,000.00 plus accrued interest will be subtracted from the GDSI Note Receivable in the original principal amount of $2,000,000.00 that will be executed and delivered by GDSI to the Reorganized Debtor on the GDSI Transaction Closing Date. In other words, that portion of the DIP Bridge Loans will not

be repaid, but rather will constitute a capital contribution by GDSI in the Reorganized Debtor. These transactions will greatly enhance the capital structure of the Reorganized Debtor.

The second DIP Bridge Loan in a maximum amount of $550,000.00, plus accrued interest, will be repaid by the Debtor and/or the Reorganized Debtor in accordance with the loan documents approved by the Bankruptcy Court. Consequently, this portion of the DIP Bridge Loans will not be credited against the GDSI Note Receivable, and payment thereof will continue to be secured by the Collateral approved by the Bankruptcy Court, as well as that certain Intellectual Property Security Agreement executed in favor of GDSI by the Debtor's President and Chief Executive Officer, Dr. Merriellyn Kett.

The Plan also is the result of extensive negotiations among the Debtor and Southport Bank, the Debtor's secured lender prior to the Petition Date, and the Committee. The Plan provides for an agreed upon payment schedule pursuant to which the Southport Bank Settlement Amount will be paid to Southport Bank in installments in full and final satisfaction of all of Southport Bank's Class 4 Claims. Of equal importance, the Plan provides for the fair and equitable treatment of all Unsecured Claims classified under Class 5 and Class 6 in a manner that the Debtor is informed and believes the Committee unanimously supports.

THIS PLAN OF REORGANIZATION IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES. ANY SUCH OFFER WITH RESPECT TO ANY SECURITIES WILL BE MADE ONLY IN COMPLIANCE WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.

NOR IS THIS PLAN OF REORGANIZATION A SOLICITATION OF ACCEPTANCES OF THE PLAN PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE. EXCEPT AS DISCUSSED BELOW, ACCEPTANCES OR REJECTIONS OF A PLAN CUSTOMARILY MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS PROCEDURE REQUIRES THE BANKRUPTCY COURT TO CONDUCT TWO HEARINGS. THE FIRST HEARING IS SCHEDULED FOR THE BANKRUPTCY COURT TO CONSIDER THE ADEQUACY OF THE DISCLOSURE STATEMENT. IF THE BANKRUPTCY COURT APPROVES THE DISCLOSURE STATEMENT, THEN A SECOND HEARING IS SCHEDULED FOR THE BANKRUPTCY COURT TO CONSIDER WHETHER THE PLAN SHOULD BE CONFIRMED. ANY SUCH SOLICITATION OF ACCEPTANCES OF THE PLAN WILL BE MADE ONLY IN COMPLIANCE WITH ALL APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE AND ORDERS ENTERED BY THE BANKRUPTCY COURT. THE PLAN HAS BEEN FILED WITH AND IS BEING SUBMITTED FOR APPROVAL BY THE BANKRUPTCY COURT, BUT THE PLAN HAS NOT YET BEEN APPROVED BY THE COURT.

4

NOTWITHSTANDING ANYTHING SET FORTH ABOVE TO THE CONTRARY, IN THIS CASE THE DEBTOR REQUESTED THE BANKRUPTCY COURT TO AUTHORIZE A COMBINED HEARING ON THE ADEQUACY OF THE DISCLOSURE STATEMENT AND CONFIRMATION OF THE PLAN. THE UST, THE COMMITTEE, SOUTHPORT BANK AND GDSI SUPPORTED THIS REQUEST, AND THE BANKRUPTCY COURT APPROVED THE DEBTOR'S REQUEST. ACCORDINGLY, THE DEBTOR FILED THIS DISCLOSURE STATEMENT WITH THE BANKRUPTCY COURT AND WILL SOLICIT YOUR ACCEPTANCE TO THE PLAN BASED UPON THE INFORMATION CONTAINED HEREIN, EVEN THOUGH THE BANKRUPTCY COURT HAS NOT YET APPROVED THIS DISCLOSURE STATEMENT.

This amended disclosure statement (the "Disclosure Statement") was filed on August 21, 2013 and discusses the Plan. Capitalized terms used, but not defined, in this Disclosure Statement shall have the meanings ascribed to them by the Plan, or as may be provided by or defined in the Bankruptcy Code, the Bankruptcy Rules or applicable judicial decisions.

[balance of page intentionally left blank]

A complete discussion of Unclassified Claims and the seven Classes of Claims and Interests contained in the Plan is set forth in Article III below.  However, the following table contains a summary of the composition of each Class, and the treatment Unclassified Claims and each class of Claims and Interests is to receive under the Plan:

| CLASS | CLAIMANT(S) | TYPE OF CLAIM(S) | AMOUNT OF CLAIM(S) | TREATMENT |
|---|---|---|---|---|
| Unclassified Claims | Administrative Claims | Post-Petition Priority Claims | $100,000 (est.) for Professional Persons employed by the Debtor and the Committee, plus ordinary course accounts payable in current but nominal amounts, if any | Unimpaired-unless otherwise agreed, paid in full upon entry of Final Order allowing Claim, or on the Effective Date, whichever is late; Claims arising in ordinary course will be paid in ordinary course. |
| 1 | Priority Claims | Pre-Petition Priority Claims | No known claims | Unimpaired–paid in full upon entry of Final Order allowing Claim, or on the Effective Date, whichever is later. |
| 2 | Tax Claims | Pre-Petition Priority Claims | No known claims | Unimpaired–paid in full through quarterly payments inclusive of interest commencing 90 days after Effective Date; the Reorganized Debtor reserves the right to prepay these Claims, if any. |
| 3 | GDSI Claims | Secured Claims secured by a senior lien on substantially all of the Debtor's property pursuant to the DIP Bridge Loan Orders and by Intellectual Property Security Agreement | $1,250,000 (est.) plus accrued interest | Impaired—initial $700,000 DIP Loan subtracted from the original principal amount of the GDSI Note Receivable; second $550,000 DIP Loan paid in accordance with its terms. |
| 4 | Southport Bank Claims | Secured Claims secured by a junior lien on substantially all of the Debtor's property pursuant to the DIP Bridge Loan Orders | $145,238.62 plus fees, costs and contingent Claims in unliquidated amounts | Impaired— Southport Bank Settlement Amount paid in full and in Cash through installments based upon 20% of Net Profit; retention of subordinate lien until paid in ful. |
| 5 | Convenience Claims | Unsecured Claims of $21,000.00 or less, or which are voluntarily reduced to $21,000.00 | $259,933.36 held by 61 Creditors | Impaired–paid 10% of Allowed Claim on the Effective Date |
| 6 | Unsecured Claims | all other Unsecured Claims | $1,594,239.64 (est.) held by 11 Creditors | Impaired–may select one of three options (a) Pro Rata distributions of Cash based upon 30% of Net Profit, (b) issuance of GDSI Stock, or (c) a combination of Option A and Option B |
| 7 | Interests | equity security in the Debtor | One shareholder | Impaired–existing shareholder will own 30% |

| | | | | of the issued and outstanding common stock of the Reorganized Debtor, and GDSI will own the other 70%. |
|---|---|---|---|---|
| | | | | |

The Debtor believes the only alternative to the Plan, other than a possible amendment of the Plan, is for the Debtor to cease its operations and to liquidate all of its property. However, as discussed in Article III.E below, the Debtor believes that under a liquidation scenario there would be insufficient funds with which to pay Secured Claims, Administrative Claims, Priority Claims and Tax Claims in full, and therefore the holders of Unsecured Claims would not receive anything on account of their Claims.

On the other hand, if the Plan is confirmed by Final Order entered by the Bankruptcy Court, then the Debtor will emerge from the chapter 11 case as a viable enterprise, its relationships with suppliers and customers including the United States government and certain of her allies will be preserved, and the holders of both Secured Claims and Unsecured Claims will receive substantial benefits:

- Southport Bank will be paid the Southport Bank Settlement Amount, whereas under a liquidation scenario it is not likely Southport Bank would be paid this amount in full, if indeed it received any distribution on account of its Class 4 Claims;
- the holders of Convenience Claims will receive a single, lump sum distribution of 10% on account of their Unsecured Claims on the Effective Date; and
- the holders of Unsecured Claims larger than $21,000.00 have the option of receiving distributions of Cash over time that could equal as much as an estimated 94% of the amount of their Unsecured Claims if the operations of the Reorganized Debtor are profitable, GDSI Stock that could possibly appreciate in value, or a combination of the two.

**THEREFORE, THE DEBTOR URGES ALL HOLDERS OF SECURED CLAIMS AND THE HOLDERS OF UNSECURED CLAIMS THAT ARE CLASSIFIED UNDER CLASS 5 AND CLASS 6 IN THE PLAN TO VOTE TO ACCEPT THE PLAN.**

**II.**

**THE PURPOSE OF A DISCLOSURE STATEMENT**

The Debtor prepared the Disclosure Statement in connection with the Plan. The Plan was filed with the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division (the "Bankruptcy Court") in the Debtor's chapter 11 Case. A copy of the Plan is appended hereto as Exhibit A.

7

One principal purpose of a disclosure statement is to provide creditors whose claims are impaired under a plan of reorganization with adequate information to make an informed and prudent business judgment when voting on the plan. The Debtor filed the Disclosure Statement to provide information regarding the Debtor, its bankruptcy Estate and the Plan. The Disclosure Statement and the discussion contained herein regarding the Plan are not meant to take the place of the Plan. Since Creditors will be bound by the Plan if it is confirmed by the Bankruptcy Court, Creditors are urged to read the Plan carefully and to consult with their own advisors about the Plan's effect on their Claims.

The information contained herein has not been subject to a certified audit. **THE DEBTOR AND ITS PROFESSIONAL PERSONS ARE UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT ANY INACCURACIES, ALTHOUGH THEY HAVE MADE GREAT EFFORT TO BE ACCURATE. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, NOR HAS THE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. NOTHING CONTAINED HEREIN OR IN THE PLAN SHALL BE DEEMED AN ADMISSION WHICH CAN BE USED AGAINST THE DEBTOR IN ANY PENDING OR FUTURE LITIGATION.**

To the extent that the Plan and the Disclosure Statement are or may be construed to be inconsistent, the Disclosure Statement states the meaning intended by the Plan; the Disclosure Statement will be read by the Bankruptcy Court to state the Debtor's intent regarding the meaning of the Plan.

## III.

## SUMMARY OF THE PLAN

The Plan classifies Claims and Interests into seven separate Classes. All Claims within each Class are substantially similar, and the Plan provides the same treatment for all Claims within each particular Class. A description of each Class contained in the Plan and the treatment of Claims and Interests classified within each particular Class are set forth below.

### A.    Description And Proposed Distribution For Allowed Claims Under The Plan

The Plan provides for payments to the following Unclassified Claims and Classes of Claims in the amounts and at the times described below. The figures set forth below may differ from the actual distributions to Creditors by reason of variations in the amounts of Allowed Claims based upon proofs of claim filed with the Bankruptcy Court on or before the Bar Date, and the existence of one or more Contested Claims.

### 1.    Unclassified Claims

Unclassified Claims consist of all Administrative Claims against the Debtor allowed under § 503 of the Bankruptcy Code. Administrative Claims are the only Claims against the

Debtor which were incurred after the Petition Date, and they consist of the Claims of Professional Persons employed by the Debtor and the Committee, and Claims incurred by the Debtor in the ordinary course of its business as a debtor in possession.

Except as provided below, the Plan provides that all other Administrative Claims shall be paid in full by the Reorganized Debtor upon the entry of a Final Order of the Bankruptcy Court allowing the payment of each such Claim (if such an order is either sought or required by applicable law), or on the first Business Day occurring on or after the Effective Date if an order is not required, unless the holder of an Administrative Claim agrees to less favorable treatment of its Claim. In paragraph 1.1.29 in the Plan, "Effective Date" is defined as the first Business Day occurring on or after the thirtieth (30th) day after the Confirmation Order is entered by the clerk on the docket of the Bankruptcy Court. For the purpose of this Disclosure Statement, the Effective Date is assumed to be November 1, 2013.

The only exception under the Plan to the foregoing treatment of Administrative Claims is Administrative Claims incurred by the Debtor in the ordinary course of its business. These Administrative Claims shall be paid by the Reorganized Debtor in the ordinary course of its business upon the same terms and conditions as agreed to by the Debtor and the holders of such Administrative Claims. The Debtor believes that all of its accounts payable incurred in the ordinary course of its business since the Petition Date will be current as of the Confirmation Date, and all such accounts payable will be paid by the Reorganized Debtor in the ordinary course of its financial affairs.

After notice and a hearing, the Bankruptcy Court authorized the Debtor to employ the following Professional Persons:

- Charles S. Stahl, Jr. and the firm of Swanson, Martin & Bell, LLP to serve as its bankruptcy counsel in this Case;
- Matthew R. Zakaras and the firm of Ginsberg Jacobs, LLC to serve as its special corporate counsel in this Case;
- James M. Faier and the firm of Faier & Faier, PC to serve as its special intellectual property counsel in this Case; and
- Steven Goldberg and the firm of Weiss & Company, LLP to serve as its accountants in this Case.

As discussed above, the Bankruptcy Court also authorized the Committee to employ Nathan Q. Rugg and the law firm of Adelman & Gettleman, Ltd. to serve as its counsel in this Case. The Debtor estimates that the unpaid Administrative Claims of the foregoing Professional Persons employed by it and the Committee will be approximately $50,000.00 to $100,000.00 as of the Confirmation Date. As provided in paragraph 5.18 in the Plan, the Claims of Professional Persons, if and when allowed by the Bankruptcy Court after notice and a hearing, will be paid in full and in Cash by the Reorganized Debtor within ten (10) days after entry of the Bankruptcy Court's order allowing each such Professional Fee Claim, or in such other manner in which the holder of each such Administrative Claim otherwise agrees.

9

All fees due and payable under Title 28, United States Code § 1930, shall be paid in full by the Debtor on or before the Confirmation Date. Until the earlier of dismissal, conversion or closure of this chapter 11 case, the Reorganized Debtor shall continue to be responsible for and pay all fees payable under Title 28, United States Code § 1930. Such fees shall be based on all disbursements made in the case and shall not be limited to payments made to Creditors or other parties in interest under the Plan. In addition, until the earlier of dismissal, conversion or closure of this Case, the Reorganized Debtor shall file with the Bankruptcy Court and transmit to the Office of the United States Trustee the U.S. Trustee Quarterly Fee Statement and U.S. Trustee Quarterly Report On Status Of Plan Payments, as provided in the United States Trustee Chapter 11 Operating Instructions And Reporting Requirements in effect in this judicial district.

### 2. Class 1 Claims

Class 1 Claims consist of all Priority Claims against the Debtor that are entitled to priority in payment under §§ 507(a)(1) to (10), inclusive, of the Bankruptcy Code; provided, however, as defined in paragraph 1.1.48 in the Plan, Priority Claims do not include Class 2 Tax Claims, even though Tax Claims also are entitled to priority in payment under §§ 507(a)(1) to (10), inclusive, of the Bankruptcy Code. Tax Claims are treated under Class 2 in the Plan because the Bankruptcy Code provides for certain specified treatment of Tax Claims under § 1129(a)(9)(C). The Debtor did not list any Priority Claims in its schedules that were filed with the Bankruptcy Court. The Debtor does not believe there are any Priority Claims, and no Priority Claims were filed with the Bankruptcy Court on or before the Bar Date. However, Class 1 was created in the Plan out of an abundance of caution in the event any Claim becomes a Priority Claim pursuant to a Final Order entered by the Bankruptcy Court, and, should this occur, then any such Priority Claim shall be treated under Class 1 in the Plan.

Under the Plan, each Priority Claim shall be paid in full and in Cash by the Reorganized Debtor upon the entry of a Final Order of the Bankruptcy Court allowing such Claim if an order allowing such a Claim is either sought or required, or on the Effective Date, whichever is later.

### 3. Class 2 Claims

Class 2 Claims consist of all Tax Claims against the Debtor that arose prior to the Petition Date and that are entitled to priority under § 507(a)(8) of the Bankruptcy Code. The Debtor did not list any Tax Claims in its schedules that were filed with the Bankruptcy Court, and no Tax Claims were filed with the Bankruptcy Court on or before the Bar Date. The Debtor does not believe there are any Tax Claims. However, Class 2 was created in the Plan out of an abundance of caution in the event any Claim becomes a Tax Claim pursuant to a Final Order entered by the Bankruptcy Court, and, should this occur, then any such Tax Claim shall be treated under Class 2 in the Plan.

Under the Plan, the holder of each Class 2 Claim shall be paid on account thereof regular installment payments in Cash of a total value, as of the Effective Date, equal to the allowed amount of such Claim, over a period ending not later than five (5) years after the Petition Date, and in a manner not less favorable than the treatment of Class 6 Claims. The first installment payment on account of each Class 2 Claim shall be made ninety (90) days after the Effective Date, and successive installment payments shall be made every ninety (90) days thereafter. Interest shall accrue from the Effective Date and be paid on the unpaid balance of

each Class 2 Claim at the rate imposed in respect to such Tax Claim under applicable law, if any, until such time as each such Class 2 Claim is paid in full. The Reorganized Debtor reserves the right to prepay any Class 2 Claim in whole or in part at any time without further interest or penalty.

### 4.    Class 3 Claims

Class 3 Claims consist of the GDSI Claims, which arose pursuant to the DIP Bridge Loan and the DIP Bridge Loan Orders. One of the DIP Bridge Loan Orders was signed on March 15, 2013, and it authorized the Debtor to borrow from GDSI up to $700,000.00 in order to preserve and sustain its operations in accordance with a 210-day budget approved by the Bankruptcy Court. Thereafter, on June 28, 2013 and August 7, 2013, the Bankruptcy Court signed two other DIP Bridge Loan Orders which increased the line of credit available to the Debtor under the DIP Bridge Loan to a maximum of $1,250,000.00. Therefore, the GDSI Claims are expected to aggregate approximately $1,250,000.00 plus accrued interest as of the Confirmation Date.

In consideration of the DIP Bridge Loan, GDSI was granted a first priority lien and security interest in virtually all, if not all, of the Debtor's property, as well as certain intellectual property in the name of the Debtor's President and Chief Executive Officer, Dr. Merriellyn Kett. Southport Bank, the Debtor's secured lender prior to the Petition Date, consented to the entry of the DIP Bridge Loan Orders and agreed that its liens and security interests in the Debtor's property could be subordinated to the liens and security interests granted to GDSI. The Committee supported the entry of the DIP Bridge Loan Orders as well.

The DIP Bridge Loan was an interim step toward the consummation of the GDSI Transaction in order to enable the Debtor to sustain its operations as the negotiation of the terms and conditions in the Plan ensued. In full and final satisfaction of the Class 3 Claims, on the GDSI Transaction Closing Date, all of the Class 3 Claims, except those GDSI Claims arising under the terms of the August 5, 2013 Note, shall be offset against the GDSI Note Receivable, and GDSI shall execute and deliver to the Reorganized Debtor any and all documents and instruments as may be necessary and required to release, terminate and expunge all liens and security interests theretofore held by GDSI in and to property of the Debtor and the Estate relating in any way to the Class 3 Claims besides those arising under and in connection with the August 5, 2013 Note. The Reorganized Debtor shall continue to perform its obligations under the August 5, 2013 Note and the GDSI Transaction according to their terms, and the Reorganized Debtor shall execute and deliver such instruments and documents to GDSI as shall be necessary and required to perform, reaffirm and assume the continued obligations of the Reorganized Debtor under the August 5, 2013 Note and GDSI Transaction according to their terms and to reaffirm and grant to GDSI a first priority lien in the GDSI Collateral to secure the Reorganized Debtor's obligations under the August 5, 2013 Note.

5.      **Class 4 Claims**

Class 4 Claims consist of the Southport Bank Claims. Prior to the Bar Date, Southport Bank filed a proof of claim in the amounts of $544,021.00 for secured loans made to the Debtor prior to the Petition Date and $271,007.44 as a contingent claim based upon the Debtor's guaranty of amounts borrowed by Badger Defense, LLC from Southport Bank. Throughout the administration of the Case, the Debtor paid monthly adequate protection payments to Southport Bank in accordance with Final Orders entered by the Bankruptcy Court, and Southport Bank applied proceeds realized from Collateral provided by other parties to the amounts owing to it.

In full and final satisfaction of the Class 4 Claims, Southport Bank shall be paid in Cash the Southport Bank Settlement Amount in the amount of $145,238.62 through annual installment payments commencing on the later of April 15, 2014, or thirty (30) days after the completion of the audit of the financial statements of GDSI and the Reorganized Debtor for 2013, and continuing every twelve (12) months thereafter on the later of April 15 of such year, or thirty (30) days after the completion of the audit of the financial statements of GDSI and the Reorganized Debtor for the preceding calendar year, until such time as the Southport Bank Settlement Amount has been paid in full, with each such installment payment equal to the lesser of twenty percent (20%) of the Net Profit realized by the Reorganized Debtor for the calendar year preceding the date of payment, or the remaining balance due on the Southport Bank Settlement Amount. Net Profit for calendar year 2013 shall be calculated based solely on the Reorganized Debtor's operations, which shall commence as of the Effective Date.

In consideration of this treatment, on the Effective Date, Southport Bank shall execute and deliver to the Reorganized Debtor any and all documents and instruments as may be necessary and required to release, terminate and expunge all guaranties theretofore executed and delivered to Southport Bank by the Debtor and all other persons relating in any way to the Class 4 Claims, including, but not limited to, all guaranties theretofore executed by Dr. Merriellyn Kett and delivered to Southport Bank.

Upon payment of the Southport Bank Settlement Amount in full, Southport Bank shall execute and deliver to the Reorganized Debtor any and all documents and instruments as may be necessary and required to release, terminate and expunge all liens and security interests theretofore held by Southport Bank in and to property of the Debtor, the Estate and the Reorganized Debtor. Until such time as the Southport Bank Settlement Amount is paid in full, Southport Bank covenants and agrees to execute and deliver any and all documents and instruments as may be reasonably requested by the Reorganized Debtor to subordinate all liens and security interests held by Southport Bank in and to property of the Reorganized Debtor to any liens and security interests granted by the Reorganized Debtor to any party that extends secured credit to the Reorganized Debtor in the ordinary course of its business.

### 6. Class 5 Claims

Class 5 Claims consist of all Convenience Claims. As defined in paragraph 1.1.22 in the Plan, a Convenience Claim is an Unsecured Claim in an amount of $21,000.00 or less, or any other Unsecured Claim as to which the holder thereof voluntarily reduces such Unsecured Claim to $21,000.00 in accordance with the instructions and procedures set forth in the Plan and this Disclosure Statement. **THE HOLDERS OF UNSECURED CLAIMS WHO ELECT TO VOLUNTARILY REDUCE THEIR CLAIMS TO $21,000.00 TO BE TREATED UNDER CLASS 5 IN THE PLAN MUST SO INDICATE THEIR ELECTION ON THE BALLOT THAT ACCOMPANIES THE PLAN.**

In full and final satisfaction of the Class 5 Claims, on the Effective Date, each holder of a Class 5 Claim shall be paid in Cash an amount equal to ten percent (10%) of such holder's Allowed Class 5 Claim. Based upon the Debtor's books and records, there are 61 Unsecured Claims of $21,000.00 or less in the aggregate sum of approximately $259,933.36. All of these Claims are classified under Class 5 in the Plan. Therefore, on the Effective Date, the Reorganized Debtor shall pay approximately $25,993.33 in full and final satisfaction of the Convenience Claims.

Section 1122(b) of the Bankruptcy Code provides "[a] plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience." The Debtor created Class 5 consisting only of Convenience Claims because the Debtor believes it is reasonable and necessary for administrative convenience. Thus, the Debtor will request the Bankruptcy Court's approval of the designation of a separate class for Convenience Claims, because

        a. Approximately 85% of all Unsecured Claims are in the amount of $21,000.00 or less; and

        b. It would be administratively convenient if the Reorganized Debtor can eliminate a large number of smaller Unsecured Claims through a single lump sum payment, rather than being required to carry such Claims on its books and records and to incur the expense of remitting small payments to this group of Creditors over a period of perhaps several years.

### 7. Class 6 Claims

Class 6 Claims consist of all Unsecured Claims that are not Secured Claims, Administrative Claims, Priority Claims, Tax Claims or Convenience Claims. The estimated aggregate sum of the Class 6 Claims held by 11 Creditors is $1,594,239.64. In full and final satisfaction of the Class 6 Claims, each holder of a Class 6 Claim shall be entitled to select one of the following three options on the Ballot accompanying the Plan and to have its Class 6 Claim treated pursuant that option under the Plan:

        a.   **Option A:** share Pro Rata in annual installment payments paid by the

Reorganized Debtor in Cash commencing on the later of April 15, 2014, or thirty days after the completion of the audit of the financial statements of GDSI and the Reorganized Debtor for 2013, and continuing every twelve (12) months thereafter on the later of April 15 of such year, or thirty (30) days after the completion of the audit of the financial statements of GDSI and the Reorganized Debtor for the preceding calendar year, until such time as the Class 6 Settlement Amount has been paid in full, with each such installment payment equal to the lesser of thirty percent (30%) of the Net Profit realized by the Reorganized Debtor for the calendar year preceding the date of payment, or the remaining balance due on the Class 6 Settlement Amount; or

                b.    **Option B:**  to be issued on the Effective Date GDSI Stock in an amount equal to fifty percent (50%) of the Allowed amount of such Class 6 Claim, with the shares of GDSI Stock valued at $.50 per share, saleable after twelve (12) months from the Effective Date with Price Protection; or

                c.    **Option C:**  to divide such holder's Class 6 Claim into two amounts as designated by such holder, with one amount designated to receive Cash distributions on account thereof pursuant to Option A above, and with the second amount to be issued GDSI Stock on account thereof pursuant to Option B above.  To illustrate, if a Class 6 Claim equals $100,000.00, the holder thereof could elect to have the amount of $60,000.00 treated pursuant to Option A above, and the balance of $40,000.00 treated pursuant to Option B above.

The Class 6 Settlement Amount is defined in paragraph 1.1.15 of the Plan as $1,500,000.00 less the aggregate sum of Allowed Class 6 Claims for which the holders thereof elect to receive GDSI Stock pursuant to Option B or Option C in Article III, paragraph 9.1.1 in the Plan.  Consequently, if all Creditors holding Class 6 Claims elect to have their Claims treated under Option A in the Plan, and based upon the assumption that Class 6 Claims aggregate $1,594,239.64, then the holders of Allowed Class 6 Claims would receive in Cash approximately 94% on account of their Claims.  Since the Debtor's future Net Profit is impossible to project under the circumstances, the Plan provides that under Option A Class 6 Claims will share Pro Rata in 30% of Net Profit on an annual basis until such time as the Class 6 Settlement Amount is paid in full.  Net Profit for calendar year 2013 shall be calculated based solely on the Reorganized Debtor's operations, which shall commence as of the Effective Date.

The holder of a Class 6 Claim that selects Option B shall be issued GDSI Stock on the Effective Date.  See the discussion below regarding GDSI.  Under applicable law, the GDSI Stock cannot be sold by the holder thereof for twelve (12) months after it is issued.  The proceeds realized at the time a holder sells GDSI Stock would determine how much the Creditor receives on account of its Class 6 Claim.  Under certain circumstances, additional shares of GDSI Stock could be issued to a holder of GDSI Stock if the conditions for Price Protection as defined in paragraph 1.1.47 in the Plan are met.

14

Finally, under Option C, a holder of a Class 6 Claim can elect to have a portion of the Claim treated under Option A and the balance treated under Option B. As provided in paragraph 3.7.2 in the Plan, the Class 6 Claim of any Creditor that does not select one of the three options on the Ballot accompanying the Plan shall be treated pursuant to Option B above.

The Debtor's President and Chief Executive Officer, Dr. Merriellyn Kett, filed a proof of Unsecured Claim prior to the Bar Date in the amount of $703,133.00 based upon loans and other financial accommodations she had provided Airtronic USA, Inc. prior to the Petition Date. If the Plan is confirmed by the Bankruptcy Court, Dr. Kett has agreed to waive any distributions on account of her Class 6 Claims so that the amounts of prospective distributions to other Class 6 Creditors are greatly increased; the effect of this voluntary concession is to increase the estimated distribution on account of Class 6 Claims from approximately 65% to approximately 94%, assuming the holders of all Class 6 Claims select Option A in the Plan.

### 8. Class 7 Interests

Dr. Kett is the only holder of equity security in the Debtor. On the Effective Date, Dr. Kett's ownership of equity security in the Reorganized Debtor will be reduced to 30%, and the balance of 70% of the issued and outstanding common stock in and to the Reorganized Debtor shall be issued and/or transferred to GDSI.

**THE FOREGOING IS A BRIEF AND SOMEWHAT SIMPLIFIED SUMMARY OF THE PLAN. ALL CREDITORS ARE URGED TO READ THE PLAN CAREFULLY AND IN ITS ENTIRETY. BY READING THE PLAN AND THE MORE DETAILED DISCUSSION BELOW, CREDITORS WILL OBTAIN A MORE COMPLETE DESCRIPTION, EXPLANATION AND UNDERSTANDING OF THE PLAN.**

### B.    Means For Implementation Of The Plan

The means for execution of the Plan are set forth in Article V of the Plan. Subject to the terms of the Plan, upon entry of the Confirmation Order, the Reorganized Debtor will be restored to full ownership of all property owned by the Debtor and all property of the Estate. Without limiting the generality of the foregoing, the Reorganized Debtor will retain all rights in and to all Causes of Action. Upon vesting, all such property will be free and clear of all Claims, liens, security interests, encumbrances, charges and other interests, except as otherwise provided in the Plan or the Confirmation Order.

The closing of the GDSI Transaction on the GDSI Transaction Closing Date, including, but not limited to, the execution and delivery of the GDSI Note Receivable by GDSI to the Reorganized Debtor, will provide the Reorganized Debtor with adequate working capital with which to pay all payments required under the Plan to be paid on the Effective Date, and to sustain and grow its business operations in the ordinary course of business. Any additional funds required to implement the Plan shall be derived from income generated by the business

operations of the Reorganized Debtor, and from any lines of credit procured by the Reorganized Debtor from time to time as it deems necessary and appropriate.

The Reorganized Debtor shall timely make all payments required under the Plan and shall make all financial disclosures required pursuant to paragraph 3.7.3 of the Plan. Until the Final Distribution has been indefeasibly paid, the Reorganized Debtor: (a) shall designate one of its executive officers to be responsible for the performance of all duties, responsibilities, and obligations of the Reorganized Debtor under the Plan (the **"Designated Officer"**); and (b) shall not sell, assign, dispose or otherwise transfer its right, title or interest in all or substantially all of its assets outside the ordinary course of its business. The Designated Officer shall also provide reasonable access to information and timely respond to inquiries by holders of Class 6 Claims relating to the payments on such claims, the Audited Financials and/or the calculation of Net Profit. In the event the Reorganized Debtor fails to make a payment to holders of Class 6 Claims when due or if the Reorganized Debtor otherwise fails to perform any covenant or agreement contained in the Plan (a **"Default"**), the obligations under the Plan will be accelerated such that the total remaining balance of the Class 6 Settlement Amount shall be immediately due and payable in full. Notwithstanding the foregoing, the Reorganized Debtor shall not be deemed to be in Default unless it has failed to cure such Default(s) within five business days after receipt of notice of Default (the **"Cure Period"**). If an alleged Default arises out of a dispute regarding the calculation of Net Profit (a **"Net Profit Dispute"**), after the expiration of the Cure Period the parties shall promptly submit the Net Profit Dispute for mediation before an independent certified public accountant selected by the Reorganized Debtor and an independent certified accountant selected by the holder(s) of the Class 6 Claims. If the selected accountants agree upon a resolution of the Net Profit Dispute within thirty (30) calendar days after the expiration of the Cure Period, then their decision shall be final and binding on the parties. If the accountants do not timely agree on a resolution of the Net Profit Dispute, then the accountants shall within fourteen (14) calendar days select a third independent certified accountant, and the decision of the third accountant shall be final and binding on the parties. For the avoidance of doubt, no party shall have the right to exercise any remedies (including, without limitation, acceleration of obligations or litigation) for a Net Profit Dispute until it has complied with all applicable notice, cure and mediation provisions of this paragraph. In the event of a Default that is not cured within the Cure Period, the party that prevails in any resulting mediation, litigation or other proceeding shall be entitled to any and all costs and expenses (including, without limitation, reasonable attorneys' fees, and mediation or litigation expenses and costs) incurred by the party in connection with such mediation, litigation or other proceeding. With respect to a Net Profit Dispute, the holder(s) of the Class 6 Claims shall be the prevailing party in the event the Net Profit calculation is increased as a result of the mediation or litigation process, and the Reorganized Debtor shall be the prevailing party in the event the Net Profit calculation is decreased as a result of the mediation or litigation process.

Also on the GDSI Transaction Closing Date, the Employment Agreement by and between the Reorganized Debtor and Dr. Merriellyn Kett, the Debtor's President and Chief Executive Officer, a copy of which is attached to the Plan as Exhibit 3, shall become binding and in full force and effect. The terms and conditions contained in the Employment Agreement were the result of comprehensive negotiations among Dr. Kett and GDSI, and their respective counsel, and the Debtor believes all such terms and conditions are fair and reasonable. Furthermore, the continuation of Dr. Kett's employment by the Reorganized Debtor is essential to its success. Dr. Kett's base salary during the first year after the Effective Date will be $200,000.00, and any other compensation paid to her as approved by the Reorganized Debtor's Board of Directors shall not be included in the computation of Net Profit.

On the Effective Date, GDSI shall issue the GDSI Stock to all Creditors entitled to receive GDSI Stock under the Plan. This pertains to the holders of Class 6 Claims who elect either Option B or Option C on the Ballot accompanying the Plan. This also includes the holders of Class 6 Claims who do not select an option set forth on the Ballot because paragraph 3.7.2 in the Plan provides that the Class 6 Claim of any Creditor that does not select one of the three options on the Ballot accompanying the Plan shall be treated pursuant to Option B above.

Also on the Effective Date, (1) GDSI shall execute and deliver to the Reorganized Debtor any and all documents and instruments as may be necessary and required to release, terminate and expunge all liens and security interests theretofore held by GDSI in and to property of the Debtor and the Estate, except for such liens and security interests that secure payment of the August 5, 2013 Note; and (2) Dr. Kett, the Debtor's President and Chief Executive Officer, shall execute and deliver to the Reorganized Debtor any and all documents as may be necessary and required to signify her agreement to waive any and all distributions of Cash and/or GDSI Stock under paragraph 3.7 in the Plan on account of her Unsecured Claims.

Except as otherwise provided in the Plan, all Creditors requesting payment of Administrative Claims, including Professional Fee Claims, incurred through and including the Effective Date shall file applications for payment no later than thirty (30) days after the Effective Date. Objections to such applications for payment, if any, must be written, filed with the Bankruptcy Court and served upon the applicant within fifteen (15) days after such application is filed with the Bankruptcy Court. The Reorganized Debtor shall pay in full and in Cash the allowed amount of each Professional Fee Claim not later than ten (10) days after entry of an order by the Bankruptcy Court allowing such Professional Fee Claim.

Confirmation of the Plan shall not be subject to the liquidation of any of the property of the Reorganized Debtor, nor is the need for further financial reorganization of the Reorganized Debtor contemplated by the Plan. No governmental regulatory commission has jurisdiction over the rates of the Debtor, and therefore no approvals of any such commission are necessary or required. The Debtor does not maintain any retirement benefit plans, and therefore the Plan need not provide for the continuation of any such plans pursuant to §§ 1114 and 1129(a)(13) of the

17

Bankruptcy Code. The Debtor and the Reorganized Debtor shall prosecute all objections to Claims, if any, without prejudice to any other Creditor asserting an objection to a Claim.

Neither GDSI, the Debtor, the Reorganized Debtor, the Committee nor any of their respective officers, directors, shareholders, employees, members, advisors, Professional Persons or agents acting in such capacity, shall have or incur any liability to, or be subject to, any right of action by any person or entity for any act or omission in connection with, relating to or arising out of the Case or matters relating to the formulation and confirmation of the Plan, except to the extent arising out of fraud, willful misconduct or gross negligence, and in all respects shall be entitled to rely reasonably upon the advice of counsel with respect to their duties and responsibilities under the Plan.

EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ON AND AFTER THE CONFIRMATION DATE, ALL PERSONS OR ENTITIES WHO HAVE HELD, HOLD OR MAY HOLD LIENS, CLAIMS OR INTERESTS IN OR AGAINST THE DEBTOR ARE, WITH RESPECT TO ANY SUCH LIENS, CLAIMS OR INTERESTS, PERMANENTLY ENJOINED FROM: (A) COMMENCING, CONDUCTING OR CONTINUING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY SUIT, ACTION OR OTHER PROCEEDING OF ANY KIND (INCLUDING, WITHOUT LIMITATION, ANY PROCEEDING IN A JUDICIAL, ARBITRAL, ADMINISTRATIVE OR OTHER FORUM) AGAINST OR AFFECTING THE REORGANIZED DEBTOR OR ANY OF ITS PROPERTY, OR ANY DIRECT OR INDIRECT TRANSFEREE OF ANY PROPERTY OF, OR DIRECT OR INDIRECT SUCCESSOR IN INTEREST TO, THE REORGANIZED DEBTOR, OR ANY PROPERTY OF ANY TRANSFEREE OR SUCCESSOR OF THE REORGANIZED DEBTOR; (B) ENFORCING AGAINST, LEVYING UPON OR ATTACHING (INCLUDING, WITHOUT LMJITATION, ANY PRE-JUDGMENT ATTACHMENT) THE REORGANIZED DEBTOR, OR ANY PROPERTY OF ANY SUCH TRANSFEREE OR SUCCESSOR; (C) ENFORCING, LEVYING, ATTACHING (INCLUDING, WITHOUT LIMITATION, ANY PRE-JUDGMENT ATTACHMENT), COLLECTING OR OTHERWISE RECOVERING BY ANY MANNER OR MEANS WHETHER DIRECTLY OR INDIRECTLY, OF ANY JUDGMENT, AWARD, DECREE, CLAIM OR ORDER AGAINST THE REORGANIZED DEBTOR, ANY OF ITS PROPERTY, OR ANY DIRECT OR INDIRECT TRANSFEREE OF ANY PROPERTY OF, OR DIRECT OR INDIRECT SUCCESSOR IN INTEREST TO THE REORGANIZED DEBTOR; (D) CREATING, PERFECTING OR OTHERWISE ENFORCING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY LIENS, CLAIMS OR INTERESTS OF ANY KIND AGAINST OR IN THE REORGANIZED DEBTOR, ANY OF ITS PROPERTY, OR ANY DIRECT OR INDIRECT SUCCESSOR IN INTEREST TO, THE REORGANIZED DEBTOR; (E) OTHER THAN AS OTHERWISE EXPRESSLY PROVIDED FOR IN THIS PLAN, ASSERTING ANY RIGHT OF SETOFF, SUBORDINATION OR RECOUPMENT OF ANY KIND, DIRECTLY OR INDIRECTLY, AGAINST ANY OBLIGATION DUE THE REORGANIZED DEBTOR, ANY OF ITS PROPERTY, OR ANY DIRECT OR INDIRECT

TRANSFEREE OF ANY PROPERTY OF, OR SUCCESSOR IN INTEREST TO, THE REORGANIZED DEBTOR; AND (F) TAKING ANY ACTIONS IN ANY PLACE AND IN ANY MANNER WHATSOEVER THAT DO NOT CONFORM TO OR COMPLY WITH THE PROVISIONS OF THIS PLAN. All injunctions or stays provided for in the Case under § 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect through the imposition of the injunction set forth in paragraph 5.14 of the Plan.

On and after the Effective Date, the Committee shall continue to exist in accordance with §§ 1102 and 1103 of the Bankruptcy Code. The Committee shall have derivative standing to assert, pursue, prosecute and settle (in accordance with Bankruptcy Rule 9019) a stated Avoidance Action(s) except as to Dr. Kett on behalf of the Debtor, the Reorganized Debtor and the Estate, as the case may be, effective upon the earlier of: (a) the Reorganized Debtor notifies the Committee in writing that the Reorganized Debtor does not intend to pursue the stated Avoidance Action(s); or (b) the Reorganized Debtor does not file an action to pursue the stated Avoidance Action(s) within fourteen (14) calendar days after receipt of the written demand issued by the Committee. Such standing shall be effective without further order of the Bankruptcy Court and without first requiring the filing of a motion or notice to any other party in interest. Upon entry of a final decree closing this Case, the Committee shall terminate automatically and without further act, notice or order of the Bankruptcy Court. Upon termination of the Committee, the Committee shall be dissolved and its members shall be released of all duties and responsibilities under the Bankruptcy Code or in connection with the Case, the Plan and its implementation, and the retention or employment of the Committee's Professional Persons and agents shall terminate.

Articles VII and IX in the Plan set forth the procedures for making distributions under the Plan and for resolving objections filed by the Debtor or any other party in interest to the allowance of asserted Claims. Among other things, those procedures provide for funds to be set aside and reserved in respect to a Contested Claim until such time as the objection to the Claim is resolved. In this manner, the interest of the holder of a Contested Claim in Cash that otherwise would be distributed to the holder of such Claim will be protected pending resolution of the objection by Final Order of the Bankruptcy Court.

## C.  Other Significant Plan Provisions

### 1.  Unexpired Leases And Executory Contracts

In addition to any and all other executory contracts assumed by the Debtor prior to the Confirmation Date pursuant to § 365 of the Bankruptcy Code, the Debtor elected under the Plan to assume all of its executory contracts and unexpired leases, including, but not necessarily limited to, the contracts and leases specifically referenced in Article IV in the Plan, with the only exception being that certain Teaming Agreement between Alliant Techsystems, Inc., Missile Subsystems and Components Division, and Airtronic USA, Inc. dated September 20, 2010 which is rejected pursuant to paragraph 4.3 in the Plan. All defaults existing as of the Petition Date

arising under the foregoing executory contracts and unexpired leases that are assumed under the Plan shall be paid in accordance with Article IV in the Plan.

## 2. Bankruptcy Court Retention Of Jurisdiction

Pursuant to the Plan, the Bankruptcy Court will retain exclusive jurisdiction after the Effective Date of the Plan for the purposes set forth in Article XII of the Plan.

### D.    Confirmation Of The Plan

The Debtor believes the Plan complies with the confirmation requirements contained in the Bankruptcy Code. In the next section and in Section VII, below (i.e., "Confirmation Of The Plan"), the Debtor describes why it believes the Plan properly classifies and treats Claims and Interests; is feasible, fair and equitable; and is preferable to any other alternative available to Creditors, including, without limitation, the liquidation of the Debtor's estate under chapter 7 of the Bankruptcy Code.

### E.    Alternatives To The Plan

The Debtor has identified two possible alternatives to confirmation of the Plan: (1) dismissal of the Debtor's chapter 11 case, or (2) liquidation of the property of the Debtor's Estate under chapter 7 of the Bankruptcy Code. The Debtor believes the following events likely would occur if this case were dismissed:

1. GDSI would immediately suspend any further extensions of credit and financial accommodations, resulting in the immediate cessation of the Debtor's business and the rapid accrual of unpaid accounts payable;

2. The orderly rehabilitation of the Debtor's financial affairs would be replaced by costly and protracted litigation involving many Creditors; and

3. The value of the Debtor's property would decrease significantly, if not be eliminated.

In summary, if this case were dismissed, the value of the Debtor's rights under chapter 11, and of its business and property, would be significantly reduced; the amount of its indebtedness would increase materially; and the likelihood that Unsecured Creditors would receive any return on account of their Claims would be remote.

The Debtor also believes the conversion of this case to a case under chapter 7 of the Bankruptcy Code would eliminate the possibility of Unsecured Creditors receiving any distribution on account of their Claims. Under chapter 7, a trustee would be appointed to liquidate the Debtor's property, and the ability of a trustee to attempt to continue the operation of the business for any extended period of time would be impossible because of the necessity that the operator of the business hold numerous licenses governing the manufacture of armaments.

Under chapter 7, no distributions customarily are made to the holders of Unsecured Claims until (1) all property of the estate has been liquidated, (2) all Secured Claims have been paid in full, (3) all Administrative Claims arising during the administration of both the chapter 7 case and the preceding chapter 11 case have been paid in full, and (4) all Priority Claims and Tax

Claims have been paid in full. If any proceeds remain from the liquidation process, they then are distributed Pro Rata to the holders of Unsecured Claims.

As demonstrated by the Debtor's balance sheet at April 30, 2013 (which was internally prepared and is subject to adjustment), a copy of which is attached hereto as Exhibit B, and the liquidation analysis attached hereto as Exhibit C respectively, the Debtor estimates that no funds would be available for distribution to the holders of Unsecured Claims if its property were liquidated under chapter 7 of the Bankruptcy Code. The liquidation analysis reflects a shortfall of over $1,378,331 in liquidation proceeds in order to pay all Secured Claims and Administrative Claims in full. Therefore, no funds would be available for distribution to the holders of Unsecured Claims. In addition, the Debtor believes the book value of its property at April 30, 2013 is insufficient to pay Secured Claims in full. Furthermore, as set forth in the Debtor's assumptions, the Debtor believes the liquidation analysis likely overstates the value of its property if it were liquidated by a trustee in bankruptcy under chapter 7 of the Bankruptcy Code because the proprietary nature of its inventory, tooling and equipment for the manufacture of armaments specifically approved by the United States Government is such that the government likely would object to its sale to a third party for fear that an enemy would come into possession of the property and would attempt to reverse engineer the weaponry.

### F. Conclusion

**THE DEBTOR BELIEVES THAT CONFIRMATION OF THE PLAN PROVIDES THE EARLIEST OPPORTUNITY FOR ALL HOLDERS OF CLAIMS TO BE PAID THE OPTIMAL AMOUNT ON ACCOUNT OF THEIR CLAIMS, AND THAT THE HOLDERS OF UNSECURED CLAIMS, PRIORITY CLAIMS AND TAX CLAIMS LIKELY WOULD RECEIVE SUBSTANTIALLY LESS, IF ANYTHING, UNDER ANY ALTERNATIVE TO THE PLAN.**

### IV.

### THE COMBINED HEARING ON THE DISCLOSURE STATEMENT AND PLAN

In most chapter 11 cases, a bankruptcy court first holds a hearing for the purpose of determining whether a disclosure statement contains information of a kind, and in sufficient detail, that would be adequate to enable a hypothetical reasonable investor, typical of each of the classes being solicited to vote to accept the Plan, to make an informed judgment regarding whether to vote to accept or to reject a proposed plan of reorganization. Once the disclosure statement is approved through this process, the proponent of the plan is authorized by the bankruptcy court to solicit acceptances to the plan, and the bankruptcy court schedules a second hearing to consider confirmation of the plan.

The Bankruptcy Court has not yet approved this Disclosure Statement. Rather, the Bankruptcy Court has scheduled a combined hearing at which it will consider approval of this Disclosure Statement and confirmation of the Plan. At the combined hearing, the Bankruptcy Court will determine whether the requirements set forth in the Bankruptcy Code for approval of this Disclosure Statement and confirmation of the Plan have been met.

**THE COMBINED HEARING IS SCHEDULED FOR OCTOBER 2, 2013 AT 10:00 A.M. (CENTRAL PREVAILING TIME) IN COURTROOM 744, 219 SOUTH**

DEARBORN STREET, CHICAGO, ILLINOIS. YOU MAY ATTEND THE HEARING AND REQUEST TO BE HEARD, BUT YOUR ATTENDANCE IS NOT REQUIRED. ANY OBJECTIONS TO CONFIRMATION OF THE PLAN SHOULD BE SET FORTH IN WRITING. OBJECTIONS MUST BE FILED WITH THE CLERK OF THE UNITED STATES BANKRUPTCY COURT AT 219 SOUTH DEARBORN STREET, ROOM 710, CHICAGO, ILLINOIS 60604, AND SERVED UPON THE UNDERSIGNED COUNSEL AT THE ADDRESS SET FORTH ON THE LAST PAGE HEREOF, BY NOT LATER THAN 4:30 P.M. (CENTRAL PREVAILING TIME), ON SEPTEMBER 24, 2013.

YOU SHOULD READ THIS DISCLOSURE STATEMENT IN ITS ENTIRETY. No statements or information concerning the Debtor, the Plan, any assets of the Debtor or the financial affairs of the Debtor, are authorized other than as set forth in this Disclosure Statement.

## V.

## THE DEBTOR AND THE BACKGROUND OF THE CHAPTER 11 CASE

### A.    History Of The Debtor

Airtronic USA, Inc. was founded in 1993 and falls into the Standard Industrial Classification Code of 3484, Manufacturer of Small Arms. It also distributes weapons and ammunition manufactured by other companies like FN for assault rifles, Manroy for .50 cal. machine guns, and RomArms for RPG-7 rockets.

The Debtor is a horizontally-integrated small arms prime contractor, combining engineering expertise and technical know-how with innovation and agility to create a company that has won awards from its two main customers, TACOM (the U.S. Army Tank, Automotive & Armaments Command) and DLA (the U.S. Defense Logistics Agency). The Debtor does not cut metal. Instead it works with suppliers such as machine shops, heat-treaters, metal stampers and a number of secondary processors to deliver high quality weapons to U.S. warfighters and friendly foreign warfighters on battlefields around the globe.

The Debtor focuses on legacy weapon systems, the weapons no military goes to war without – the M203 Grenade Launcher, the .50 cal. Machine Gun, and the MK 19 Grenade Machine Gun. The Debtor broadened its focus to include adding capability to the AK assault rifle and improving the RPG-7 rocket launcher. These weapons are considered "forgiving weapons." They can be used by untrained operators, and they continue firing even without regular maintenance.

In the market space of grenade launchers and rocket launchers, competition is based on quality and on-time delivery, not price. The Debtor holds the current 5-year, 50,000 unit M203/M203A2 Grenade Launcher contract and was named "sole source" for RPG-7 Rocket Launchers by TACOM.

The Debtor is a member of the National Small Arms Technology Consortium and serves on the Machine Gun and Grenade Launcher subcommittee. It was at an NSATC meeting that the

22

Debtor was asked to reverse engineer the RPG-7 for friendly foreign militaries. The Debtor was selected as integrator of the M203 Managed Lethality Grenade Launcher System. This system adds nonlethal capability to a lethal weapon a soldier is already carrying.

The Debtor fell into financial difficulties on three fronts. Its lender, Southport Bank of Kenosha, Wisconsin, suspended the Debtor's line of working capital. The Debtor invested in a barrel company, Badger Barrel also in Kenosha, and never was able to manage the business properly. The Debtor was the victim of a protracted and what it considered to be frivolous lawsuit which consumed hundreds of thousands of dollars in defense costs. None of the Debtor's missteps arose from its core business.

In 2003 when the land war began in Iraq, the Debtor made a decision to focus on the legacy weapon systems – the M203 Grenade Launcher, the .50 Caliber Machine Gun, and the MK 19 Grenade Machine Gun. Airtronic won its first multi-million dollar award of $4.1 million dollars in 2005 to manufacture 900,000 M9 pistol magazines, an item in short supply. Automating the entire magazine manufacturing process also made it possible to deliver 30,000 magazines every week until the order was filled five months ahead of schedule.

That early delivery of high volume, high quality product at an attractive price was the first step in the Debtor's strategy to become a supplier of at least one of the three important legacy weapon systems. In 2003, the Debtor operated with a Type 7 license from the Bureau of Alcohol, Tobacco, Firearms, and Explosives. A Type 7 license confers the right to manufacture firearms and ammunition, excluding destructive devices and armor piercing ammunition. The Debtor immediately applied for a Type 10 license to manufacture destructive devices, a much more difficult license to obtain, but a requirement to bid on the M203 40 mm Grenade Launcher contracts. In 2006, the Debtor won all three M203 Grenade Launcher awards – for the M203, the M203A1 and the M203A2. In 2010, the Debtor won the new five-year, 50,000 unit award on a best value basis, not because it was the lowest cost offeror, but because it was the lowest risk offeror.

The Debtor sells to friendly foreign militaries through Foreign Military Sales and Foreign Military Funding awards made by the United States Department of Defense. The Debtor sells directly to friendly foreign militaries. The Debtor also uses brokers to sell to foreign militaries.

Dr. Merriellyn Kett is the Debtor's president and Chief Executive Officer. A description of Dr. Kett's background is attached hereto as Exhibit D.

### B. Events Leading To The Involuntary Bankruptcy Filing

As discussed above, five of the Debtor's larger Unsecured Creditors filed an involuntary petition against the Debtor in March 2012. The Debtor then converted this Case to a Case under chapter 11 of the Bankruptcy Code so that it could rehabilitate its financial affairs for the benefit of all of its Creditors.

23

A former officer and minority shareholder of the Debtor had incorporated a company, Badger Defense, LLC, which he believed would be compatible with the Debtor's operations. However, that venture proved highly unsuccessful, and, after diverting management's time away from the Debtor's affairs and creating undue tension among the Debtor's senior management regarding the proper focus on the Debtor's core operations, it became a burden and drain on the Debtor's financial condition.

The Debtor also was sued by Trident Enterprises, Inc., a company with which the Debtor's former minority shareholder had engaged in a misguided business venture. The lawsuit was protracted and extremely costly, depriving the Debtor of sorely needed working capital with which to take advantage of its business opportunities. Although a jury entered a verdict in favor of Trident in the amount of $968,000.00, the United States district court judge who had presided over the trial tossed out the verdict because Trident has failed to offer any proof of its claimed damages. However, under applicable state law, Trident was nonetheless entitled to seek reimbursement of its fees and costs. Trident sought an award of $453,682.20. The trial judge cut this request to $181,472.88. Trident filed an appeal from this judgment, but it was dismissed when this Case was commenced. Throughout the pendency of the lawsuit, the damage to the Debtor was severe and precluded the Debtor from paying its Creditors in a timely manner. Trident filed a proof of claim in the Case asserting a Claim in excess of $1 million. However, after notice and a hearing, the Bankruptcy Court entered its Final Order sustaining the Debtor's objection to the proof of claim and allowing Trident's Unsecured Claim in the amount of $181,472.88.

Additional information concerning the Debtor is contained in copies of its financial statements as of December 31, 2009, 2010 and 2011 that are attached hereto as Exhibit E.

C.    **Significant Events During The Reorganization Case**

1. **The Debtor's Ability To Use Cash Collateral**

Under applicable bankruptcy law, a debtor in possession seeking to operate its business under chapter 11 cannot use its cash receipts in which a creditor holds a security interest unless the creditor consents to such use and/or the bankruptcy court enters an order authorizing the use of this cash collateral.

In this case, Southport Bank held a security interest in the Debtor's inventory, accounts receivable and cash receipts due to security interests granted to it in consideration of secured loans and other financial accommodations it extended to the Debtor prior to the Petition Date. The Debtor was able to resolve its initial disputes with Southport Bank, and on June 6, 2012; July 9, 2012; July 25, 2012; August 15, 2012; and September 13, 2012, the Bankruptcy Court entered orders authorizing the Debtor to use cash collateral in which Southport Bank held an interest. These orders enabled the Debtor to continue operating its business in the ordinary course of business. The orders also granted Southport Bank certain liens and security interests in property acquired by the Debtor after the Petition Date, approved specific budgets detailing the purposes for which the Debtor could use the cash receipts, and directed the Debtor to pay Southport Bank stipulated monthly payments to assure that Southport Bank's interests were adequately protected. The Debtor complied with all of these orders.

## 2. The Debtor's Compliance With Applicable Rules

A debtor seeking to rehabilitate its financial affairs under chapter 11 must comply with a number of rules and procedures.  Throughout the administration of this Case, the Debtor has complied with all such rules and procedures, including the filing of its schedules and statement of financial affairs, attendance at the meeting of Creditors conducted by the UST, the filing with the Bankruptcy Court of monthly operating reports containing a summary of its receipts and disbursements, and the payment of quarterly fees to the UST.

## 3. The Debtor's Authority To Incur Secured Credit

After the Petition Date, the Debtor actively sought an investor to provide working capital and assist in the rehabilitation of its financial affairs.  In or about August 2012, the Debtor commenced discussions with GDSI. These discussions culminated in a letter of intent pertaining to the DIP Bridge Loan and a contemplated merger upon confirmation of a plan of reorganization.

On October 17, 2012, the Debtor filed an emergency motion with the Bankruptcy Court requesting approval of the DIP Bridge Loan pursuant to which, among other thing, the Debtor would be authorized to borrow up to $750,000.00, GDSI would be granted a senior lien and security interest in the Debtor's property, and the liens and security interests held by Southport Bank would be subordinated to the liens and security interests sought to be granted to GDSI. After extensive negotiations, both Southport Bank and the Committee consented to all of the relief requested by the Debtor.  On October 19, 2012, the Bankruptcy Court entered an agreed order granting the Debtor's motion.

The funding of the DIP Bridge Loan necessitated an investment in GDSI by an investor. Although GDSI procured an investor, medical issues and other business matters delayed the investor's investment in GDSI until 2013.  During this period, the Debtor's affairs deteriorated, requiring a modification of the terms initially agreed to and approved by the Bankruptcy Court. On March 11, 2013, the Debtor filed a motion requesting the Bankruptcy Court's approval of a modified DIP Bridge Loan agreement. Both Southport Bank and the Committee supported the Debtor's request.  On March 15, 2013, the Bankruptcy Court entered its order approving the modified agreement pursuant to which the Debtor was authorized to borrow up to $700,000.00 in accordance with a 210-day budget.

Thereafter, the Debtor received purchase orders aggregating in excess of $900,000. However, the cost to complete these orders was not encompassed by the 210-day budget approved by the Bankruptcy Court. Consequently, the Debtor filed two additional motions with the Bankruptcy Court requesting authority to increase its line of credit under the DIP Loan by $550,000.  In June and August, 2013, the Bankruptcy Court entered two additional DIP Bridge Loan Orders granting the Debtor's motions, increasing the DIP Loan to a maximum of $1.25 million and approving a 270-day budget. Based upon its current projections, the Debtor believes the increased DIP Loan will enable the Debtor to complete the new purchase orders and otherwise sustain its operations until the Effective Date.

In addition, the Debtor has been able to conclude negotiations with Southport Bank, the Committee and GDSI regarding the terms contained in the Plan.  The Debtor now is poised to

reorganize its financial affairs for the benefit of all of its Creditors as a result of the financial support provided by GDSI.

### 4. About GDSI (OTC Pink: GDSI)

GDSI's management previously carried out a private to-public company roll up that grew from $1 million to $350 million in annual revenue over five years. Richard J. Sullivan is GDSI's Chairman and Chief Executive Officer. He is the founder of Solutions, Inc. and was the founder of and former Chairman and Chief Executive Officer of Applied Digital Solutions, Inc. ("Applied Digital")(NASDAQ: DIGA). Applied Digital was formed in 1993 and went public via a reverse merger in 1994. Prior to launching Applied Digital, Mr. Sullivan successfully employed roll-up strategies with other high growth companies, including his work as a founder of Manufacturing Data Systems, Inc. ("MDSI"). MDSI was sold to Schlumberger in 1978 for the highest then price per share paid for an OTC stock - $76 per share.

Mr. Sullivan's approach to each new company was to take advantage of certain market trends, technological advances and industry consolidations to build, through organic growth and strategic acquisition, a company with proven products and solid earnings. The new company would be the cornerstone of an entity that could potentially top $500 million in sales and would be built from the acquisition of companies with strong earnings and synergy with the company's business and technology plans. In the case of Applied Digital, the company's chosen niche was wireless technology. The first acquisition was of a company involved in wireless data collection applications for manufacturing. This initiative initially made use of money raised through private investment. To take the company to the next level and conduct the wide-ranging acquisition program he envisioned, Mr. Sullivan decided to utilize reverse merger as the means to access public capital.

Mr. Sullivan worked with Applied Digital's lead lender to develop a compelling story for the new company and mounted a several-month-long program of broker contact, financial community contact, an intensive road show and investor conference presentations. This resulted in the company being supported by seven market makers and over one dozen retail investment banking firms. Important goals were increasing market valuation and name recognition within the investment community. Over time, strong retail support positioned Applied Digital for the long term and opened the door to increasing participation by institutional and other investors, earning Applied Digital a large retail investor following.

Applied Digital acquired a diverse portfolio of technology companies, including over 25 technology companies in the span of four years, and made significant investments in bringing new and upgrade products to market. After it became successful, Applied Digital had access to up to $150 million in operating and acquisition credit lines, as well as access to a combination of long term debt and equity instruments.

The proposed GDSI growth and acquisition strategy is consistent with that of Applied Digital in many ways. GDSI's first acquisition target is Airtronic USA, Inc. due to the Debtor's

focus on the manufacture of armaments for military and national defense. GDSI believes it can be successfully positioned to take advantage of the current market conditions for consolidation of military armaments manufacturers. The efficient use of pubic capital and post-private placement, as was the case in the successful Applied Digital experience, will be employed. Through the effective use of "Best Practices" and technology-driven collaboration, GDSI has the ability to efficiently consolidate profitable military armaments manufacturers that, in GDSI's management's opinion, will add earnings, market share and intellectual property assets to the Reorganized Debtor. The military armament industry is heavily fragmented and presents a favorable environment for consolidation. GDSI has a highly qualified executive management team that understands the market and is able to proficiently identify winners and deliver results. GDSI's management has built and successfully exited multiple private to-public company roll up strategies for investors. GDSI's ability to leverage the unique features of its communication platform and virtual work place should translate into higher earnings for the Reorganized Debtor.

As set forth in Article X in the Plan, members of GDSI's management team will augment the Reorganized Debtor's management, all the while serving without compensation. Joining Dr. Kett on the Reorganized Debtor's Board of Directors will be an appointee of Dr. Kett and an appointee of GDSI. Mr. David A. Loppert, GDSI's Chief Financial Officer, a chartered accountant, a business colleague of Mr. Sullivan's for many years and a former senior officer of several public and private corporations, will serve as Chief Financial Officer, Treasurer and Secretary of the Reorganized Debtor. Additional biographical information concerning Messrs Sullivan and Loppert is attached hereto as Exhibit D.

GDSI Stock was trading at approximately two cents per share when GDSI commenced discussions with Dr. Kett in or about August 2012 regarding a possible merger transaction. On August 20, 2013, GDSI Stock closed at $.96 per share. GDSI Stock to be issued pursuant to the Plan is valued at $.50 per share, a 48% discount to its current market value.

Since GDSI has not had material operations since 2004, it terminated its reporting requirements as it was allowed to do under applicable Federal securities laws. Nonetheless, throughout this period, GDSI's common stock has continued to trade over the counter on pink sheets. However, with its planned merger with the Reorganized Debtor now at hand, GDSI has commenced taking steps to become a reporting public corporation and to have its shares traded over a national exchange. Recent press releases and public filings by GDSI are readily available on the Internet, including a copy of its Form 10 filed with the Securities and Exchange Commission in August 2013 which discusses fully GDSI's history, its management and its contemplated merger with the Reorganized Debtor.

## VI.

## DESCRIPTION OF THE PLAN

Chapter 11 of the Bankruptcy Code allows debtors to attempt to reorganize their financial affairs for the benefit of themselves, their creditors and other parties in interest. The filing of a

petition under chapter 11 triggers the automatic stay pursuant to § 362(a) of the Bankruptcy Code, which bars all attempts to collect pre-petition claims from a debtor, to enforce liens on a debtor's property, or otherwise to interfere with a debtor's property and its business affairs. The filing of the petition also creates an estate comprised of all legal and equitable interests of a debtor in property as of the date the petition was filed. Sometimes the UST for the appropriate district appoints a committee of unsecured creditors to represent the interests of unsecured creditors in a case. The Committee was appointed by the UST to serve in this case.

The Plan is the method by which the Debtor proposes to satisfy the Claims of all of its Creditors and Interest holders. The Plan provides for the classification and treatment of Creditors' Claims and the disposition of the Debtor's assets. A summary of the Plan's classification and distribution scheme is set forth below.

### A.    Classification Of Claims And Distribution To Classes

The Plan divides Claims and Interests against the Debtor into seven classes which the Debtor believes are in accordance with the provisions contained in § 1122 of the Bankruptcy Code. Priority Claims, Tax Claims, the Secured Claims of GDSI and Southport Bank, Convenience Claims, Unsecured Claims and Interest are each assigned separate Classes under the Plan. Administrative Claims are treated as Unclassified Claims.

A Claim will receive a distribution under the Plan only if it is an "Allowed Claim." An Allowed Claim means a Claim against the Debtor to the extent that proof of such Claim was timely filed or deemed timely filed, and to which any objection to the allowance thereof has been litigated or settled, and which is allowed by a Final Order of the Bankruptcy Court. Distributions to holders of Allowed Claims under the Plan are in full satisfaction of those Allowed Claims. Except as provided in the Plan, all Claims against the Debtor arising prior to the Confirmation Date will be discharged.

### VII.

### CONFIRMATION OF THE PLAN

In order to confirm the Plan, the Bankruptcy Code requires the Bankruptcy Court to make a series of determinations concerning the Plan, including that: (i) the Plan has classified each Creditor in a permissible way, (ii) the contents of the Plan comply with the technical requirements of chapter 11 of the Bankruptcy Code, (iii) the Debtor has proposed the Plan in good faith, and (iv) the Debtor's disclosures concerning the Plan have been adequate and have included information concerning all payments made or promised in connection with the Plan and the bankruptcy case. The Debtor believes that all of these conditions, and all other applicable conditions, have been met, and the Debtor will seek a ruling to this effect at the combined hearing on approval of this Disclosure Statement and confirmation of the Plan scheduled before the Bankruptcy Court on October 2, 2013.

The Bankruptcy Code also requires that the Plan be accepted by requisite votes of Creditors if the solicitation of acceptances is required, that the Plan is feasible, and that confirmation of the Plan is in the "best interests" of all Creditors. To confirm the Plan, the Bankruptcy Court must find that all of these conditions are met. The classification, "best interests" and feasibility conditions to confirmation are discussed below.

## A. Best Interests Of Creditors

In order to confirm the Plan, the Bankruptcy Court must determine that the Plan is in the best interests of Creditors. The "best interests" test requires that the Bankruptcy Court find that the Plan provides each member of each impaired class of Claims and Interests with a recovery which has a present value at least equal to the present value of the distribution each such Creditor would receive if the Debtor's property were liquidated under chapter 7 of the Bankruptcy Code. As discussed below under "Alternatives To The Plan," the Debtor believes that the Plan is in the best interests of all of its Creditors.

## B. Feasibility

As another condition to confirmation, the Bankruptcy Code requires that confirmation is not likely to be followed by the liquidation of the Debtor's property or the need for further financial reorganization. The Plan does not provide for the liquidation of any property of the Reorganized Debtor subsequent to the Confirmation Date, nor is the need of further financial reorganization foreseen.

The Plan also is feasible. Upon the GDSI Transaction Closing Date, all of the Reorganized Debtor's property will be free and clear of liens and security interests excepting only those liens and security interests securing payment of the August 5, 2013 Note, allowing the Reorganized Debtor to procure a line of credit if and as necessary. Moreover, the GDSI Note Receivable will provide the Reorganized Debtor with substantial working capital in order to pay its obligations as they come due and to pursue the many business opportunities the Debtor was unable to pursue in the past.

## C. Acceptance

As another condition to confirmation, the Bankruptcy Code requires that each impaired class of Claims and Interests accept the Plan, with the exceptions described in the following section. The Bankruptcy Code defines acceptance of a plan by a class of Claims as acceptance by holders of two-thirds in dollar amount and a majority in number of Allowed Claims of that class, but for that purpose counts only those Creditors who actually vote to accept or to reject the Plan. Thus, your vote on the Plan is important. Based upon its negotiations with Southport Bank and the Committee, the Debtor believes the voting requirements for confirmation will be met.

## D. Confirmation Without Acceptance By All Impaired Classes

Section 1129(b) of the Bankruptcy Code permits confirmation of a plan despite non-acceptance of one or more impaired classes, as long as at least one impaired class of Claims has accepted the plan.

If an impaired class of Claims rejects the Plan, the Plan may still be confirmed so long as it provides that the holder of any Claim or Interest that is junior to the Claims of such class will not receive or retain any property on account of such junior Claim or Interest. The Bankruptcy Code also permits the Plan to be confirmed over the objection of a dissenting class member if the "best interests" test and other requirements of §1129(a) of the Bankruptcy Code are satisfied. In the Plan, the Debtor has reserved the right to seek confirmation of the Plan under § 1129(b) of the Bankruptcy Code if necessary.

### E. Alternatives To The Plan

The Debtor believes that the Plan provides its Creditors with the greatest possible returns that can be realized on their respective Claims. The alternatives to confirmation are discussed above, and the Debtor believes that the alternatives to confirmation are much less desirable to Creditors.

The Debtor has not attached projections to this Disclosure Statement because it is impossible to project the Reorganized Debtor's financial affairs with any degree of accuracy under the circumstances. All products and armaments manufactured by the Debtor are pursuant to specific purchase orders issued by the United States Government or her allies. An individual purchase order can be quite large, but the timing of receipt of a purchase order is unknown. For example, the Debtor recently received one of two large purchase orders that have been approved by the government for the sale of weapons to an ally and that all funds for the purchase orders are on deposit with the government. The one purchase order is valued at approximately $660,000.00, and although the Debtor expected both purchase orders to have been received and completed by this time, the second purchase order has not yet been issued due, at least in part, to a change in personnel at the governmental agency and the sequester. As a result, the Debtor's sales thus far in 2013 have been negligible.

The Debtor has successfully concluded negotiations with a large national defense contractor pursuant to which the Debtor will become a sole source supplier of certain weapons to the defense contractor. The Debtor has received two initial purchase orders for approximately $330,000.00. Consequently, the Debtor's prospects for the remainder of the year and into next year appear bright, but the Debtor has no control over the timing of the issuance of future expected purchase orders.

The Debtor also has had significant discussions with foreign allies throughout the administration of this chapter 11 case, and the Debtor expects to demonstrate field presentations of certain of its products to these contacts shortly after the GDSI Transaction Closing Date, at which time the Reorganized Debtor will have sufficient working capital to complete testing of certain products and conduct the expensive field demonstrations.

Despite the fact that the Debtor presently is unable to project its future operations with any degree of precision, the Plan provides Southport Bank and the holders of Class 6 Claims will continue to receive their respective specified percentages of Net Profit until the Southport Bank Settlement Amount and the Class 6 Settlement Amount are paid in full.

### F. Effect Of Confirmation

Except as provided in § 1141(d) of the Bankruptcy Code, the provisions of the Plan will (i) bind the Debtor and all Creditors, whether or not (a) the Claim of any Creditor is impaired under the Plan and (b) such Creditor has accepted the Plan; and (ii) terminate all rights, Claims and Interests of such Creditors, except as otherwise provided in the Plan. As of the Effective Date, all property administered by the Plan shall be free and clear of all Claims of Creditors, except as otherwise provided in the Plan.

### G. Combined Hearing On The Disclosure Statement And The Plan

The Bankruptcy Court will conduct a combined hearing to consider approval of this Disclosure Statement and on confirmation of the Plan commencing at **10:00 a.m. (prevailing Central Time) on October 2, 2013, in Courtroom 744, United States Courthouse, 219 South Dearborn Street, Chicago, Illinois.** The combined hearing may be adjourned from time to time as announced by the Bankruptcy Court in open court on said date without further notice to Creditors. Any objection to approval of this Disclosure Statement and/or confirmation of the Plan must be in writing, must state the grounds therefor, and must be filed with the Bankruptcy Court and served upon counsel for the Debtor at the address set forth on the final page of this Disclosure Statement, on or before **4:30 p.m. (prevailing Central Time), on September 24, 2013.**

## VIII.

## TAX CONSEQUENCES OF THE PLAN

All Creditors are urged to consult with their own tax advisers concerning the impact the Plan will have on their tax planning.

## IX.

## CONCLUSION

The Debtor believes the Plan provides for the maximum recovery for all Creditors of the Debtor. Accordingly, the Debtor believes approval of the Plan is in the best interests of the Debtor and its Creditors.

Dated: August 21, 2013

Respectfully submitted,

AIRTRONIC USA, INC.

By: */s/ Merriellyn Kett*_____
Its:  President and Chief Executive Officer

By: */s/ Charles S. Stahl, Jr.*_____
        One of its attorneys

Charles S. Stahl, Jr. (Atty. No. 02699915)          Amy Z. Knapp (Atty. No. 6271655)
Swanson, Martin & Bell, LLP                          Thomas B. Fullerton (Atty. No. 6296539)
2525 Cabot Drive, Suite 204                          Swanson, Martin & Bell, LLP
Lisle, Illinois 60532                                330 North Wabash Avenue, Suite 3300
 (630) 799-6990                                      Chicago, Illinois 60611
Fax: (630) 799-6901                                  (312) 321-8430
                                                     Fax: (312) 321-0990